Thank you, your honors. I'm Gary Logan. I represent Mr. Nehme. In this case, as you know, this involves the nonpayment of a $500,000 gaming marker that was issued to Las Vegas Sands by Mr. Nehme. Las Vegas Sands, Inc. operates the Venetian Hotel in Las Vegas, which is one of the largest hotels in the city. Mr. Nehme, for your edification, and this is in the record, lost and paid, before the incident in question, in excess of $1,200,000. He never welched on any of his bets. He not only paid the Venetian, but he also paid Circus Circus, Paris, and other hotels. But in this case, there came a time, I should say before this case, there came a time when he knew he had a problem. And under Nevada law, under the Nevada gaming regulations, a casino patron has the right to limit or cut off his credit. And he does that by notifying the casino that I want to either terminate my credit or I want to limit it. When you say he has a right, I think everybody recognizes that. But is the exercise of that right, once it's exercised, irrevocable? In other words, if you tell the Sands, no more credit, five years later, you can say, I want to reopen my credit license. No, you can't do it. You already cut it off. No, you can reinstitute it. You can reinstitute the original credit line, Your Honor. But there is a procedure for doing that. Say there is a procedure established by whom? Established by the particular hotels. And is there anything in the record here on the Venetian's procedure? Yes, there is deposition testimony. And the testimony is, and we put this forth in the brief, it isn't the casino credit department that decides whether or not the credit will be reinstituted. It is the legal department. And in this case, nobody ever acknowledged receipt of the letter by the Venetian. The Bennett letter? The Bennett letter, yes. Of course, technically, there's no evidence that such a letter was ever sent, right? Well, Your Honor, there's the U.S. postal return receipt. Which was not admitted into evidence. Yes, it's in evidence. Well, it was part of your motion for reconsideration, right? No, Your Honor, it was turned over to me in discovery. I know that, but that doesn't put it into evidence. Well, Your Honor, nobody ever denied that that letter was received. That was never an issue. Well, Judge Sandoval specifically ruled that he wasn't going to take notice, he wasn't going to admit it in evidence, the letter and the receipt, because it wasn't properly authenticated. Right. Was he wrong? Yes, he was. Why was he wrong? He was terribly wrong. He doesn't have to be terribly wrong. This has to be wrong. See, the letter, Your Honor, first of all, the Venetian never objected to the letter. They turned it over to me. Now, wait a minute. You're mixing up two things. They can give it to you in discovery. That doesn't mean it's admitted in evidence, right? That's true. All right. So let's just consider what happened in court. Was there an objection by Venetian? First of all, was the letter and was the postal receipt offered in evidence? It was submitted with the papers in opposition to the motion for summary judgment. It was submitted as an exhibit to an affidavit, or was it just submitted like a letter in the mail? Well, it was submitted like it was a letter in the mail. I would have no way of proving that the letter was received by the Venetian. No, but you had a way of proving the letter was written. Yes. You could have gotten Mr. Bennett to give you a declaration or an affidavit saying this is a copy of a letter which I sent. I sent a certified mail return receipt request a witness number. I got back a certified receipt which I attached to the letter, and in my file I've kept it in regular course of business. That affidavit was never procured. Was there any reason why Bennett didn't give you an affidavit? No, Your Honor. He did give us an affidavit. On the motion for reconsideration. Yes. Right. On the first round. On the first round. No. No. And the reason for that was is because it was turned over to us during discovery, and there was never any objection to the court considering that letter. So the court solely objected. Exactly. Well, in the court, did Judge Sandoval say something? Was there a hearing on this motion? No, there was not, Your Honor. All right. So no one got a chance to tell the judge, well, there's no objection to the letter. We both agree it's genuine and should be considered. That's true. Nothing like that happened. No. But in the materials, didn't the casino's attorneys say assuming without finding or they led you to believe that there wasn't any dispute about the letter and the postal receipt? Of course not, Your Honor, because these documents were turned over to me by the Venetian. And I'm referring to the Venetian interchangeably with Las Vegas Sands. Presumably from the business records of the Venetian, right? Yes, absolutely. Do you know what the inquiry was that caused them, what the specific discovery request was that caused them to turn that over to you? Well, we have that, you know, that meeting. The Rule 16 disclosure. Right, exactly. And numerous documents were turned over to me by the Venetian. And never once did anyone challenge the fact that the Venetian received the letter. Mr. Logan, may I ask you this? Is it your position that once the Venetian received the Bennett letter, no further credit should have been given on the credit application which Mr. Neamey had filled out earlier? Absolutely. And that if he was to get any further credit, he would have to fill out a new credit application and have that approved by the legal department? I don't know that he would have to fill out a new credit application. That's not part of your position? No, no. But what is your position, that there were a custom and practice that the renewal of any credit had to be approved by the legal department, not only the casino management? I never knew that until I conducted discovery. Is that your position? My position is that when they received that letter, they were under a duty, according to their own credit application, to cancel the credit. But you do admit that the credit can be renewed. It can be renewed. Under what process? At the Sands, it can be renewed when the legal department permits credit to be reinstituted. What in the record shows that that is a custom and practice upon which a reasonable gambler, if there is such a thing, would rely? What in the record? Yeah. You're saying the legal department had to approve it. Fine. I'm saying that at the Sands, that's the case. All right. But you're not under oath and you're not a witness, and this isn't a trial court. My question is, where in the record is there any indication that the legal department had to approve a renewed credit? There's deposition testimony. All right.  I cannot, Your Honor. It's a testimony. Well, give me at least the name of the person who's deposing. Carol. No, it wasn't Carol. It was ‑‑ I want to say it was the vice president of credit, Weiner, Mr. Weiner. And I don't believe that he's with the hotel anymore. Maybe his deposition caused that. I don't know. I do know that in other places, it's normally the credit department that makes the decision. And there is a ‑‑ Mr. Hogan, I don't want to argue your case for you, but isn't your general position that there isn't enough evidence in the record to decide these questions and, therefore, it was improper to grant summary judgment? And so we should be allowed to develop the record further? Well, absolutely. That's what's called a lifeline. It's a very unusual case and a very unusual outcome. And with that, I'm going to reserve. I guess I have four more minutes. Good morning. May it please the Court. My name is Kim DeMarchi, and I represent the Las Vegas Sands in this matter. Let me start with the issue of a dispute about receipt of the letter. Well, before you get there, could you sort of follow up on Judge Bea's question about, is there anything in the record about the Sands internal procedures or whatever procedures they might tell their customers about renewing or reinstating a credit agreement? No, but there was an attempt to put such information in the record. Let me back up and explain the procedural history behind that answer. There was a motion for summary judgment filed by the Las Vegas Sands in this case before the close of discovery. Then there was a cross motion filed by Mr. Naney at the close of discovery after depositions had been taken. So these issues essentially got briefed twice in two summary judgment motions that were filed months apart. What got briefed twice? What issue? The issue of whether the marker was enforceable given the alleged February 2005 letter. Each party filed a motion for summary judgment. And that depends on, partly at least, on whether the credit agreement was reinstated? No. It doesn't depend on that in any way because the marker is independently enforceable as a negotiable instrument under Nevada law. I know that. But if it's, you know, reinstated contrary to the credit agreement, isn't that a separate breach of contract? First of all, no counterclaim for breach of contract was ever filed in this action. It's the defense. Secondly, all the contract says is we will cancel or reduce your credit line on your request. It doesn't say we'll never let you ask for another increase. It doesn't say we promise to go through the legal department if we ask for an increase. No, no, no. But, you see, if the Bennett letter had been admitted and that's the state of the record, then the record stops at the point of he requested termination, so it should have been terminated. There's no evidence on what happened after that. There is. There's the marker itself, which is dated and signed in September 2005 and is independently enforceable. Are you saying the marker itself can serve to reinstate the credit agreement, or the credit agreement doesn't have to be reinstated? The credit agreement doesn't have to be reinstated. The marker itself would be sufficient to permit my client to recover. And Nevada law actually says. Did you sue on the marker only? We sued on both the marker and the credit agreement, and we actually threw in a claim for unjust enrichment, which was dismissed because you can't have both contract and unjust enrichment. We sued on both the marker and the credit agreement. Was that dismissed? There was a third claim for unjust enrichment. All right. And that was dismissed. We don't have a problem with that. And how did Judge Sandoval rule on the – on both theories? Did he grant you a summary judgment on both? Or you can't tell? I'm not sure that I can tell. Because the letter was used by the defendant as a defense to both the marker action and the contract action. So there's not a lot of clarity about that. I'm afraid I still haven't answered your record question, and I didn't want to let that go unanswered. Go ahead. So with two summary judgment motions, in the cross motion filed months later, Mr. Naney's counsel attached some exhibits. Among the things he attached were snippets from various people's depositions without the cover sheet or the reporter's certification. All of those deposition excerpts were also stricken by the district court judge because of the failure to authenticate them by including the cover sheet and the reporter's certification. One of those stricken pieces of evidence does talk about the Venetian's internal credit process. So I don't want to misrepresent the record. He did that against struck those even though you didn't object to them, right? Even though we didn't object to them. There was just a stickler for procedure. Which is well within the district court's discretion and consistent with the law. And that's really the important issue here. The district court has the discretion to enforce the rules of evidence, and the rules of evidence say you've got to authenticate things like this letter. It does? Where does it say that? Well, the Orr case talks about how you can't oppose summary judgment with inadmissible evidence. And there's been some suggestion that the Postal Service card would authenticate the letter, the receipt of the letter. What's important is not the existence of the letter. It doesn't matter if it ever came out of a typewriter somewhere. What matters, well, what matters on Mr. Naney's theory of the case doesn't matter to the Venetian because we have a marker that's independently enforceable. What about Mr. Naney's? Let me get back to that theory about independently enforceable. You see, here's my problem with that theory. If it's independently enforceable, then, you know, the right to, say, having a credit agreement and terminating the credit agreement is all just meaningless, right? It doesn't mean a thing. Yes, but this is what this is actually a question that Adam. Not only is it meaningless, it's misleading. You're telling somebody who's addicted to gambling, if you tell us not to give you any credit, we will cut you off and a big wink, but we'll give you a marker, pal, right? It's important to understand two things. First of all. Can you answer that? Isn't it misleading? It is not because if you look at the language of the actual contract, all it says is we will cancel or reduce. It doesn't say we'll never again extend you credit. It doesn't say you'll have to go through a special process to extend credit. It just says if you say lower my credit line, we'll lower your credit line. It doesn't make any promises about the future. You know, we have a policy of, you know, not encouraging our customers to overextend themselves. And what we know, what it says is we follow Nevada law on problem gaming essentially. And what Nevada law says about problem gaming is that saying you're a problem gambler is not a defense to a marker. But look what you're saying, what your client's saying. The Venetian Resort Hotel endorses responsible gaming. That may be an oxymoron, but nonetheless, responsible gaming. And then following that immediately, it says we will cancel or reduce your credit line upon your request so that you can be a responsible. You never use the word gambler. Use responsible gamer. Right. Now, you put that together with your argument and you say your argument is judge. Just take a couple of a pair of scissors and just cut that out because it has no relevance at all. The marker's the marker. It's a negotiable instrument, and we're entitled to get money on it, right? It's not my argument. It is the statutory policy of the state of Nevada. It is NRS 463.368, subsection 7. And this is what it says. The failure of a person to comply with the provisions of this section, which is the section about problem gaming, the section that Mr. Namie's counsel referenced when he said that people in Nevada have a right to say, please cut off my credit. The failure of a person to comply with this section letting people cut off their credit or the regulations of the Nevada Gaming Commission does not invalidate a credit instrument or affect the ability to enforce the credit instrument or the debt that the credit instrument represents. So the Nevada legislature. Is there a Nevada Supreme Court case that discusses the relationship between a credit agreement and a marker or not? There are a number of Nevada cases. What's your best case on that? Can you give me a citation? They're cited in the summary judgment papers. In the summary judgment papers? In the summary judgment papers, which are in the excerpts of record. I can try to find them while we're talking. But I do want to mention the record evidence about the letter itself. Because all of this discussion assumes that Mr. Namie presented admissible evidence that we had actually received the letter prior to September 2005. And he didn't. And this is why. He submitted a copy of the letter. And ultimately he submitted a copy of the little green card that you get back when you send mail, return receipt. With the identical number that the letter carried saying that it was a return receipt requested, right? And let me. Just take those circumstances. Why isn't that sufficient evidence to make it self-authenticating? Because of the way in which that card is created. If you look at the card. How do we know how the card is created? Because the card itself tells you how the card is created. Excerpt of record 194. Then we'd have to allow the card into evidence to believe what the card says. Do you stipulate to that? No, I do not. I didn't think so. Because in considering the admissibility of evidence and whether it is self-authenticating under 9014, of course you look at the document to see if it's self-authenticating. And you can look at the document to see if it's self-authenticating without admitting it into evidence. That's just part of the process of considering its admissibility. If you look at the card, this card, three-quarters of the information on this card is prepared by the sender. And you can tell that because it has instructions for how to complete it. Sender, complete sections one, two, and three. Tell us where you want to send it. Write down that 20-digit number yourself that you also are putting on your letter. That's not a number generated by the Postal Service. That's a number generated by the sender. And complete the service type. And you have the option in completing the service type to restrict delivery so that only the person it's addressed to can sign for it. And that's not an option that's checked on this card. Then you have the upper right-hand corner, which is generated through the delivery process. But here, it's not signed by the person it was addressed to. It's, in fact, not signed by anyone who the deponents could identify as having signed it. And it bears a date stamp, but the date stamp is not a Postal Service date stamp. It's just a stamp with a date, just like you get at a public library or in any number of business offices. It's just a plain date stamp. There's nothing about this that authenticates delivery by the Postal Service. The Postal Service has records when it delivers things. Those weren't produced. And notably, this document does not bear a Bates number suggesting that the Venetian produced this in discovery. But as I understand your case about the marker, all this evidentiary fuss is meaningless, right? Yes. It doesn't affect the marker at all. But as it happens, the district court was correct on the evidentiary fuss as well, and either one is a sufficient reason to affirm that. Even the citation to your Nevada revised statutes, again, says that nothing that is stated in the credit agreement can vitiate the effectiveness of a negotiable instrument with a marker. It is NRS 463.368-7. And what it says is that failing to follow Nevada law on problem gaming, which is the law that's referenced in the credit agreement, does not invalidate the debt or the collectability of the debt. So now let's talk about authentication by disclosure, because that's another argument that you heard today. The Venetian produced the Bennett letter in discovery, so we must have received it. The Venetian doesn't dispute that we got it eventually. We just dispute that we got it in February. Mr. Naney's attorney sent a second letter in December and reattached his February letter to his December letter. That is the time at which the deponents said they first saw the letter. The December letter appears in the record at excerpts 119 to 120. You consider that the date of receipt of the letter, the Bennett letter, whether it was received in February or received in December, is a material issue, right? I mean, if you received in December, too late. By that time, the guy had gotten his marker and spent half a million dollars. If you received it in February, at least Mr. Logan would say you shouldn't have given him a marker. So the date of receipt seems to me to be a triable issue of fact on a material issue. It would be a triable issue of fact, but the issue is not a material issue of fact, because legally, even if we had received the Bennett letter, and what's important here is it would only be a triable issue if actual admissible evidence had been submitted in response to some of the charges. So you're relying on your statute saying it doesn't make a darn bit of difference what the credit agreement is or the circumstances under which credit was given, so long as a marker is executed and out there, it's a negotiable instrument and we can get it paid for, regardless of what we said in the credit agreement, regardless of what a reasonable person would take away from the credit agreement, period. I mean, that's a clear position. That's a clear position. And that's your position. That's my first position. My second position is the credit agreement itself on its face makes no promises about what the casino will do after the credit line is reduced or canceled. It doesn't make any promises. What is responsible gaming in Sam's view? What is responsible gaming? There is no record evidence on that, Your Honor. Well, what do you think it means? You're not authorized to make a statement on behalf of your principal. I'm certainly not authorized to make that statement because that isn't an issue that was ever raised in the trial court. There was no issue ever raised in the trial court by Mr. Namey that there was a misrepresentation in the contract, that he was misled by the contract. But there is record evidence. It's at excerpts of record 192, 196, and 202 in which in depositions the SANS representative said, we never got this letter. And that evidence was attempted to be introduced by Mr. Namey, not by my client. I've exhausted my time. Thank you very much. Thank you. Mr. Logan, I'm going to have a question for you, and that is, how do you read Nevada Revised Statute 463.368 that was read by counsel, and how do we get around that if we want to rule in your favor? Very simply, Your Honor. I'll refer you to NRS 104.3117, which is part of the Uniform Commercial Code. Okay. 104 what? 104.3117. Parent seven. No. Free point. 104.3117. I will read it to you. The obligation of a party to an instrument, to pay the instrument, may be modified, supplemented, or nullified by a separate agreement of the obligeur, which in this case is Mr. Namey, and a person entitled to enforce the instrument, which in this case is the Venetian, if the instrument is issued or the obligation is incurred in reliance on an agreement or as part of the same transaction giving rise to the agreement, to the extent that an obligation is modified, supplemented, or nullified by an agreement under this section, the agreement is a defense to the underlying note. Next question. Has the Nevada Supreme Court ever taken a look at the Sands Statute 463.3687 and your statute 104.317 and interpreted the two of them together your way? They've never interpreted either one of these statutes, Your Honor, in the gaming context. So do you have a suggestion that we certify a question to the Nevada Supreme Court to determine what Nevada law is on this subject? I don't know that you need to do that, Your Honor, because I think the Uniform Commercial Code clearly provides that this marker, which is a negotiable instrument under Nevada law, it is the same as a check, that that document can be modified or nullified by the credit application agreement. And certainly the purpose of this statute, or I should say the regulation, which gives a patron the right to cut off his credit, cannot be made effective unless the casinos do what they're supposed to do under the terms of the credit application, which is cut the person off. And it is the only way that people who come to Las Vegas can be assured that their compulsions cannot allow them to be carried away. Under Nevada law, intoxication is not a defense to a gaming marker. And that is one of the reasons they've instituted the regulation. It's not a statute, Your Honor. It's a regulation, and we attach it as an addendum to our reply brief. And the purpose of that statute, or the reg, is to preclude these casinos from literally burying clients. Your time is up. Thank you. Thank you, Morgan. The case of Las Vegas Sands LLC versus Mena. Submitted.
judges: Reade, Tashima, Bea